IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| FRANCIS BARNWELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:13-cv-00019 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Francis Barnwell brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434 (the "Act"). On appeal, Barnwell argues that the Commissioner erred in failing to find that he met the listing for chronic pulmonary insufficiency, discounting the opinion of his treating cardiologist Dr. Ajit Chauhan, M.D., and failing to consider the combined effects of his impairments in assessing his residual functional capacity ("RFC"). The Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and this case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). After carefully reviewing the record, I find that the Commissioner's decision is not supported by substantial evidence and respectfully recommend that the case be remanded for further administrative proceedings.

I.     Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its]

1

judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to

her past relevant work based on his or her residual functional capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II.   Procedural History

Barnwell was born in 1963 (Administrative Record, hereinafter "R." 155), and during the relevant period was considered a "younger" individual under the Act. 20 C.F.R. § 404.1563(b), (c). He has a bachelor's degree and an associate's degree and has worked in several jobs including mental health counselor, case manager, and instructor. (R. 44–45, 185.) In his September 6, 2011, application for DIB, Barnwell alleges that he became disabled on August 25, 2011, due to congestive heart failure, diabetes, and pulmonary fibrosis. (R. 17, 176.) After rejecting Barnwell's application initially and on reconsideration (R. 61–87), the Commissioner convened a hearing before an Administrative Law Judge ("ALJ") at Barnwell's request on October 18, 2012. (R. 40–60.)

On November 30, 2012, the ALJ issued his final decision finding Barnwell not disabled and denying him benefits. (R. 17–39.) The ALJ found that Barnwell had severe chronic heart failure, chronic obstructive pulmonary disease ("COPD"), chronic renal failure, diabetes mellitus with peripheral neuropathy, obstructive sleep apnea, and obesity, but that these impairments did not meet or equal the severity of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19–21.) The ALJ then found that Barnwell retained the capacity to perform sedentary work except that he could stand or walk for only two hours in an eight-hour work day; climb ramps and stairs, balance, stoop, kneel, crouch, and crawl only occasionally; and never climb ladders, ropes, or scaffolds, and he must avoid exposure to fumes, odors, dusts, gases, or poorly

ventilated areas. (R. 21.) At step four, he found that Barnwell could perform his past relevant

work as a mental health counselor as that job is generally performed in the national economy.

(R. 32.) Alternatively, the ALJ found that Barnwell could perform other work existing in

significant numbers in the national economy, specifically as a general office clerk and a records

clerk. (R. 33.) Accordingly, he found Barnwell not disabled under the Act. (R. 34.)

### III. Facts

#### A. Medical Records

On November 22, 2010, Barnwell saw Dr. Namrita Baveja, M.D., a nephrologist at

Danville Urologic Clinic (R. 1247–48.) Dr. Baveja diagnosed stage 3 chronic kidney disease

with glomerular filtration rate of 59. (R. 1248.) He noted that Barnwell's blood pressure was "not

at goal," and that although Barnwell "claim[ed] to have taken his medications this morning," he

admitted "having dietary indiscretion" and not checking his blood sugars daily. (*Id.*) Dr. Baveja

emphasized with Barnwell his "risk factors of hypertension and diabetes and their control." (*Id.*)

At a follow-up visit on February 15, 2011, Barnwell reported doing well, and Dr. Baveja noted

that his creatinine level was stable. (R. 1243.) Dr. Baveja prescribed Tekamlo, discontinued

Norvasc (amlodipine), and had Barnwell stop taking potassium gluconate. (R. 1242–43.)

Barnwell saw a neurologist for electromyography ("EMG") testing on December 20,

2010. (R. 328–29.) The exam was "consistent with severe motor sensory neuropathy most likely

secondary to … long lasting [diabetes] since age 25." (*Id.*)

Barnwell was admitted to the emergency room at Danville Regional Medical Center

("Danville RMC") on March 11, 2011, for recurring episodes of non-exertional chest pain.

(R. 412.) His chest pain resolved on its own, and doctors discharged him the following day with

a diagnosis of "chest pain, rule out for myocardial infarction" and chronic diastolic heart failure.

(R. 412–13.) On March 13, Barnwell was admitted to the emergency room at Morehead

4

Memorial Hospital with complaints of shortness of breath. (R. 252.) An echocardiogram showed "severe concentric LVH with an estimated [ejection fraction] of 55% to 60%" and a "left ventricular diastolic filling pattern consistent with elevated mean left atrial pressure." (R. 252.) A two-day LEXA cardiolite study showed "some equivocal left ventricular perfusion changes." (R. 252.) Barnwell showed no chest pain or electrocardiogram ("EKG") changes during the stress test portion of the study. (*Id.*) He was asymptomatic by March 15 and was discharged that day. (R. 252.) Doctors diagnosed "acute but mild congestive heart failure secondary to diastolic dysfunction." (R. 253.) They started Barnwell on Lopressor, but discontinued Actos "as it can aggravate congestive heart failure." (*Id.*) Barnwell saw Dr. Carl Winfield, M.D., his primary care physician, on March 17, 2011. (R. 290–91.) Dr. Winfield increased Barnwell's Lopressor and asked him to follow up in two months. (*Id.*)

Barnwell first saw cardiologist Dr. Chauhan on March 31, 2011, on referral from Dr. Winfield for exertional and non-exertional chest pain. (R. 813–16.) Barnwell reported that he could walk half a mile without difficulty, gets chest pain after walking for an hour, and gets short of breath after walking a quarter mile or climbing a flight and a half of stairs. (R. 813.) Barnwell also complained of fatigue, orthopnea, and nocturia. (*Id.*) Dr. Chauhan noted that Barnwell had a normal echocardiogram and left heart catheterization in 2009, but that his current EKG showed left ventricular hypertrophy with ST segment changes. (R. 815.) Dr. Chauhan arranged for a stress cardiolite and an echocardiogram, gave Barnwell nitroglycerin, and advised him to "go straight to the ER with any further [chest pain]." (*Id.*)

Barnwell followed up with Dr. Chauhan on April 14, 2011. (R. 817–19.) He complained of suffering chest pain at rest for 10 to 15 minutes daily, but reported he could walk a quarter of a mile three days per week without difficulty. (*Id.*) Barnwell also complained of orthopnea,

swelling in his right foot and non-productive cough, and Dr. Chauhan noted that he showed "NYHA Class 1–2 symptoms."[1] (R. 818.) Dr. Chauhan observed that Barnwell's b-type natriuretic peptide ("BNP") was high at 401, "most likely due to his chronic kidney disease." (*Id.*) Dr. Chauhan also indicated that Barnwell was non-stressable due to his risk for coronary artery disease. (*Id.*) An echocardiogram on April 28, 2011, showed massive left ventricular hypertrophy, trace mitral regurgitation, top normal right ventricular size, and ejection fraction of 55–60%. (R. 833.)

Barnwell saw pulmonologist Dr. Thomas O'Neill, M.D., on May 12, 2011, for shortness of breath that had increased significantly over the past four months. (R. 763–65.) A chest x-ray was "basically normal" except for moderate cardiomegaly. (R. 762.) In a walking oximetry test, Barnwell was able to walk 520 feet in 6 minutes, and his oxygen saturation remained above 93%. (R. 764, 793.) Spirometry showed FVC of 2.25 L (58% predicted) and FEV1 of 1.98 L (64% predicted). (R. 800.) Barnwell did show "significant severe decrease in diffusion capacity," with diffusing capacity for carbon monoxide ("DLCO") of 38% predicted. (R. 764, 802.) Dr. O'Neill noted no evidence of obstructive process and sent Barnwell for a lung CT scan and methacholine challenge. (R. 764.)

---

[1] The New York Heart Association's (NYHA) four-level staging system classifies heart patients by the extent of their functional limitations. Patients at Class I have cardiac disease, but no limitation of physical activity; ordinary physical activity does not cause undue fatigue, palpitation, dyspnea, or angina pain. Patients at Class II have only slight limitation of physical activity. They are comfortable at rest, but ordinary physical activity results in fatigue, palpitation, dyspnea, or angina pain. Patients at Class III have marked limitation of physical activity. They are comfortable at rest, but less than ordinary activity causes fatigue, palpitation, dyspnea, or angina pain. Patients at Class IV are unable to carry on any physical activity without discomfort and may have symptoms of heart failure or anginal syndrome even at rest. Am. Heart Ass'n, *Classification of Functional Capacity and Objective Assessment* (1994), *available at* http://my.americanheart.org/professional/StatementsGuidelines/ByPublicationDate/PreviousYears/Classification-of-Functional-Capacity-and-Objective-Assessment_UCM_423811_Article.jsp.

On May 20, 2011, Dr. O'Neill noted that Barnwell was "feeling poorly" and had "a low grade fever" with "productive significant discolored sputum." (R. 790.) Arterial blood gas tests showed a $PO_2$ (partial pressure of oxygen) of 65 mmHg and a $PCO_2$ (partial pressure of carbon dioxide) of 32 mmHg, both below normal. (R. 795.) Dr. O'Neill diagnosed "dyspnea, class 5 at present, both cardiac and pulmonary" and "acute sinotracheitis, question pneumonia without obstruction" and sent Barnwell to the emergency room. (R. 791.) Doctors at Danville RMC noted Barnwell to be in "mild respiratory distress" with sharp chest pain "rating a 5 out of 10." (R. 344.) They diuresed him with Lasix and administered doxycycline and Rochepin for possible bronchitis. (*Id.*) Barnwell was discharged on May 22 with a 7-day prescription for doxycycline. (R. 344, 346.) On discharge, doctors indicated a diagnosis of "Acute [COPD] exacerbation" as well as "acute on chronic congestive heart failure exacerbation." (R. 344.)

On June 21, 2011, Barnwell followed up with Dr. Chauhan. (R. 820–22.) Barnwell told Dr. Chauhan that he had no routine exercise regiment and would get short of breath after walking one block. (R. 820.) Dr. Chauhan noted that Barnwell "is not in heart failure." (R. 821.) He gave Barnwell three clonidine to reduce his blood pressure and also prescribed a TTS patch. (*Id.*)

Barnwell returned to the Danville RMC emergency room on July 11, 2011, complaining of shortness of breath. (R. 341.) A right-sided heart catheterization showed "what appears to be pulmonary venous hypertension with elevated wedge pressure of [29], moderate-severe pulmonary mean pressure of 42, with normal pulmonary vascular resistance of 2.97 Wood units." (R. 341, 602–05.) These results indicated moderately severe pulmonary hypertension. (R. 603.) An echocardiogram showed "left ventricular hypertrophy, left atrial enlargement, trace pericardial effusion with an ejection fraction of 55%, mild mitral regurgitation, [and] right ventricular asystolic pressure … estimated to be around 30." (R. 341.) A chest x-ray showed

"increased interstitial changes [and] mild adenopathy, suggestive of possible underlying sarcoid." (R. 605, 616–17.) A progress note dated July 12 states that Barnwell has "fairly severe hypertension with medication noncompliance" and suggests that Barnwell's medication "should be adjusted to decrease his wedge pressure," which should result in "significant improvement in his respiratory status." (R. 605.) Barnwell was discharged on July 13 with a primary diagnosis of pulmonary hypertension, a prescription for Norvasc, and instructions to follow a "low-sodium, diabetic diet." (R. 341–42.) The discharge note states that Barnwell "could be considered high risk for re-admission due to noncompliance with diabetes as well as hypertension medications." (R. 342.)

Later that day, Barnwell was readmitted to Danville RMC "for shortness of breath and likely congestive heart failure." (R. 579.) A chest CT scan showed an increased pleural effusion (*i.e.*, excess fluid build-up around the lungs). (R. 579, 614–15.) "Aggressive diuresis with intravenous Lasix" caused the fluid to dissipate and "greatly" improved Barnwell's shortness of breath. (R. 579, 594.) Doctors "kept [Barnwell] for several days" to try to lower his blood pressure, which initially proved difficult. (*Id.*) An echocardiogram on July 19 showed "right ventricular dilation, which is old," "mild … pulmonary regurgitation with blunted PR slope … consistent with pulmonary hypertension," and right ventricular systolic pressure increased to 44 from 30 eight days earlier. (R. 589–90.) Barnwell was discharged on July 20 with "much more acceptable blood pressure," "normal baseline breathing function," and "markedly decreased" lower leg edema. (R. 579–80.) Doctors increased his Lasix, stopped his Norvasc "in the setting of congestive heart failure," and prescribed Coreg and hydralazine. (R. 580.)

Barnwell followed up with Dr. O'Neill on July 27, 2011. (R. 781–84.) Dr. O'Neill noted that Barnwell missed an appointment at UVA and that a hospital pulmonologist thought that

most of Barnwell's pulmonary problems were secondary to his cardiac or renal conditions. (R. 781–82.) Dr. O'Neill indicated that he agreed with this assessment. (R. 783.) On August 2, Barnwell complained of increased dyspnea, and Dr. O'Neill noted markedly decreased air entry. (R. 776–80.) An arterial blood gas test showed a lower than normal pO2 result of 68 mmHg on room air. (R. 794.) Dr. O'Neill diagnosed "multi-factoral" dyspnea of at least class 4 and chronic hypoxemia. (R. 777.)

On August 24, 2011, Dr. O'Neill noted that Barnwell was "feeling poorly" and that his chest showed markedly decreased air entry. (R. 771–75.) Later that day, Barnwell reported that he was feeling worse, and Dr. O'Neill told him to go to the Danville RMC emergency room where he was admitted with shortness of breath on exertion. (R. 773, 1040.) An echocardiogram showed "right ventricular systolic pressure of 51 with right ventricular dilation, concentric left ventricular hypertrophy, ejection fraction of 55%, left atrial enlargement of 4.8, mild mitral regurgitation, [and] mild to moderate tricuspid regurgitation. (*Id.*) A chest CT scan showed nonspecific "diffuse ground glass attenuation throughout the lungs" suggestive of "mild pulmonary edema." (*Id.*) Doctors attempted to diurese Barnwell with Lasix, but stopped when his creatinine increased. (*Id.*)  A doctor noted "the complexity of [Barnwell's] case and the fine balance between obstructive sleep apnea, pulmonary hypertension, and kidney disease." (*Id.*) Barnwell's creatinine returned to baseline on Lasix 40 mg every other day, and he was discharged on August 28 with a primary diagnosis of "dyspnea on exertion, likely multifactorial including diastolic congestive heart failure, acute, as well as obstructive sleep apnea." (*Id.*) Barnwell was instructed to restrict his salt and fluid intake and was set up with supplemental oxygen to use at home. (R. 1041.)

On September 3, 2011, Barnwell returned to Danville RMC complaining of increasing shortness of breath and leg swelling. (R. 498.) At the hospital, Barnwell was diuresed, and his shortness of breath improved. (R. 495.) He was discharged on September 5 with a primary diagnosis of "dyspnea, likely secondary to acute exacerbation of diastolic heart failure." (*Id.*) Doctors noted that Barnwell "does seem to be noncompliant with his medications." (R. 496.)

On September 6, 2011, Barnwell followed up with Dr. O'Neill, who advised him to see a specialist at Duke University Hospital ("Duke"). (R. 766–70.) On September 13, Barnwell saw Dr. Terry Fortin, M.D., at Duke. A pulmonary function test showed Barnwell's FVC at 1.72 L (35% predicted), his FEV1 at 1.40 L (36% predicted) and his DLCO at 11.7 mL/mmHg/min (40% predicted). (R. 808.) These results were noted to be consistent with "severe restrictive lung disease" and "substantially reduced" diffusion capacity. (*Id.*) Dr. Fortin also reviewed Barnwell's existing test results, which led her to conclude that he had "secondary pulmonary hypertension and not pulmonary arterial hypertension." (R. 810.) Dr. Fortin noted that elevated right-sided pressures from a recent catheterization "show[ed] diastolic heart failure." (R. 811.) She noted that his CT scans did not "look classic for sarcoid," which concerned her because it suggested that fluid in Barnwell's lungs was "related to heart failure." (*Id.*) Dr. Fortin was also concerned by Barnwell's need for oxygen, which he had started using recently, and "other findings," including his low DLCO. (*Id.*)

Summarizing Barnwell's history of present illness, Dr. Fortin noted that "things really seem[ed] to worsen in spring of 2011," and she observed that Barnwell "is markedly limited in his activity level and that has been worsening" and that "[h]e is on reasonable medicines for his diastolic dysfunction." (R. 810.) Dr. Fortin stressed to Barnwell the importance of using his

10

CPAP and losing weight. (R. 811.) Because his blood pressure was "inadequately controlled," Dr. Fortin gave him prescriptions for hydralazine and a higher dose of carvedilol. (*Id.*)

Barnwell followed up with Dr. Chauhan on September 29, 2011. (R. 823–25.) Barnwell reported that, since spring, he would become short of breath after walking half a block. (R. 823.) He complained of increasing shortness of breath over the past couple of days to the point where he could walk only five to ten feet before getting short of breath. (*Id.*) He also noted worsening swelling in his feet and wheezing. (*Id.*) Dr. Chauhan noted that Barnwell's most recent EKG was unchanged from the previous one. (R. 825.)

On September 29, 2011, Barnwell was admitted to Duke with complaints of "increasing shortness of breath and volume overload." (R. 855.) A chest x-ray taken that day showed "increased patchy bilateral perihilar opacity and pulmonary vascular congestion, consistent with pulmonary edema." (R. 876.) A Doppler echocardiograph showed normal left ventricular systolic function with severe left ventricular hypertrophy, normal right ventricular systolic function, and mild mitral and tricuspal regurgitation. (R. 874.) A chest CT scan on October 4 showed some nonspecific diffuse ground glass opacities, "possibly representing some minimal edema[,] infections or inflammatory alveolitis[,] or potentially smoking-related lung disease" and "decreasing adenopathy" with "small pleural effusions." (R. 877.) A stress test that day showed normal results. (R. 881.) A cardiac catheterization on October 6 showed "markedly elevated filling pressures" unchanged from the previous study and "secondary pulmonary hypertension from diastolic heart failure" with "normal PVR and cardiac output." (R. 867.) During his admission at Duke, doctors aggressively diuresed Barnwell with intravenous furosemide, which led to "significant improvement in … symptoms" and "significant weight loss." (R. 856.)

Doctors started Barnwell on oral torsemide on October 7, and he continued to diurese well. (*Id.*) Barnwell was discharged on October 9 with "significant improvement in his symptoms." (*Id.*)

Barnwell followed up with cardiologists at Duke on October 13, 2011. (R. 842–46.) He reported feeling much better since leaving the hospital, and he denied chest pains, cough, wheezing, dyspnea on exertion, or shortness of breath. (R. 844–45.) He also reported that his peripheral edema had improved. (R. 845.) The nurse practitioner noted that Barnwell "present[ed] with NYHA Class II symptoms in the setting of euvolemia" and that the September 30, 2011, echocardiogram was consistent with grade III diastolic dysfunction.[2] (R. 843, 845.)

Barnwell followed up again at Duke on November 7, 2011, with complaints primarily of gastrointestinal problems and elevated blood sugars. (R. 838–41.) Barnwell stated that his shortness of breath and dyspnea had improved, and a nurse practitioner noted he exhibited NYHA Class II symptoms. (R. 839.) The nurse also indicated that "[g]iven the increase in his BUN and creatinine … he may be slightly volume depleted in the setting of diarrhea," and Barnwell's diuretic was decreased. (R. 840.)

On January 5, 2012, Barnwell complained to Dr. Chauhan of increased mid-sternal chest pain over the past two nights. (R. 887–90.) Dr. Chauhan added a diagnosis of pulmonary hypertension and told Barnwell to see if oxygen helped. (*Id.*) He instructed Barnwell to continue fluid and salt restriction, lose weight, and get better control of his blood sugar. (*Id.*) On February 6, Barnwell reported getting no regular exercise because of his neuropathy. (R. 1193–95.) Dr.

---

[2] Patients with diastolic dysfunction are classified into four stages based on diastolic filling pattern. Unlike the NYHA classification system, the grades of diastolic dysfunction are based on objective medical, rather than functional criteria. However, grade II diastolic dysfunction usually causes NYHA class II or III symptoms, and grade III diastolic dysfunction usually causes NYHA class III or IV symptoms. *See* Eric J. Topol & Robert M. Califf, *Textbook of Cardiovascular Medicine* 426–27 (3d ed. 2007).

Chauhan noted that Barnwell's EKG was unchanged and that he was "not in heart failure and doing well." (*Id.*) He prescribed compression stockings for complaints of dizziness and instructed Barnwell to wear a Holter monitor. (*Id.*)

Barnwell underwent pulmonary function testing on February 15, 2012. (R. 898–903.) Spirometry showed an FVC of 3.12 L (65% predicted) and an FEV1 of 2.83 L (80% predicted), consistent with a moderate decrease in diffusing capacity. (R. 898.) The FEV1/FVC ratio showed no evidence of obstructive lung defect. (*Id.*) Barnwell's DLCO was measured at 15.8 mL/mmHg/min (49% predicted), indicative of moderate decrease in diffusing capacity. (R. 899.)

On March 6, 2012, Barnwell reported shortness of breath at rest, increased edema, and nonproductive cough. (R. 1190–92.) Dr. Chauhan noted decreased breath sounds, worsened foot swelling, and increased thoracic fluid content and BNP. (R. 1191.) He also noted that Barnwell had gained 8 pounds and was 13 pounds over his goal weight. (*Id.*) Dr. Chauhan increased Barnwell's torsemide and prescribed Albuterol. (*Id.*) On March 12, Dr. Chauhan provided a surgical clearance (R. 1186–89), presumably to address a mass (gynecomastia) in his left breast (R. 944-46). That surgery had been scheduled for February 2012, but the surgeon canceled it because Barnwell's "sugars were out of control." (R. 944.) Barnwell reported shortness of breath upon walking three yards, a nonproductive cough lasting two weeks, bilateral leg edema, orthopnea, and PND.[3] (*Id.*) Dr. Chauhan noted that he has diastolic heart failure, obstructive sleep apnea, bronchiectasis, severe restrictive pulmonary disease, moderately severe pulmonary hypertension, and a history of chronic pulmonary disease. (*Id.*)

---

[3] "PND" stands for paroxysmal nocturnal dyspnea; it refers to "recurrent episodes of shortness of breath that occur when an individual lies in the recumbent position, typically during nocturnal sleep." Charles P. Pollak, Michael J. Thorpy & Jan Yager, *The Encyclopedia of Sleep and Sleep Disorders* 170 (3d ed. 2010).

On March 14, Barnwell saw Dr. Baveja for continued management of chronic kidney disease. (R. 1391–93.) Dr. Baveja noted that Barnwell had been "lost to follow up" since his last visit in August 2011. (R. 1393.) He noted that Barnwell's kidney disease had been worsening, with his last creatinine test at 2.3, up from 1.6 to 1.8 "in the past." (*Id.*) Because Barnwell's dyspnea rendered him unable to exercise, Dr. Baveja emphasized low-calorie and low-salt diets. (*Id.*) Two months later, Barnwell's kidney creatinine level was stable, and his blood pressure was well controlled. (R. 1381–82.)

On April 2, 2012, Barnwell complained of shortness of breath on walking 10 feet, an episode of shortness of breath while at rest, bilateral pedal edema, nonproductive cough, orthopnea, PND, and fatigue. (R. 1183–85.) Barnwell's blood pressure was very elevated. (R. 1184.) Dr. Chauhan administered clonidine and noted that Barnwell's blood pressure stabilized 30 minutes after he took his medication. (*Id.*) He increased Barnwell's lisinopril, wrote a prescription for Levemir, and again noted that Barnwell was not in heart failure. (*Id.*)

Barnwell followed up with Dr. Chauhan on May 8, 2012. (R. 1180–82.) Barnwell reported a 10-minute long episode of chest pain while sitting the previous day and said he could walk only half a block before becoming short of breath. (*Id.*) An echocardiogram taken on April 24 showed ejection fraction of 60–65%, E dominance, normal diastolic function, massive left ventricular hypertrophy with increased left ventricular mass, top normal right ventricular size, and left atrial enlargement. (R. 1210.) Dr. Chauhan noted that Barnwell was not in heart failure and that severe hypertension was likely the cause of his chest pain. (R. 1181.)

Barnwell was admitted to Danville RMC on May 29, 2012, for shortness of breath. (R. 1081.) Chest x-rays showed no infiltrates or effusions, and arterial blood gas tests were largely within normal limits. (*Id.*) However, Barnwell's creatinine was elevated to 3.75 above a

baseline of 1.77, indicating acute kidney injury. (*Id.*) Doctors discontinued Barnwell's ACE inhibitors and Lasix. (*Id.*) Barnwell was discharged on June 1. (*Id.*)

On June 4, 2012, Barnwell complained of shortness of breath after walking 10 feet and chest discomfort on exertion. (R. 1177–79.) He told Dr. Chauhan that he was using his oxygen constantly. (*Id.*) An echocardiogram taken two days earlier showed ejection fraction of 55–60%, massive concentric left ventricular hypertrophy, significantly increased left atrial enlargement, diastolic heart failure with grade II diastolic dysfunction, and right ventricular dilation of 3.0. (*Id.*) Dr. Chauhan noted that Barnwell was not in heart failure. (*Id.*) A left heart catheterization on June 7, 2012, showed mild to moderate pulmonary hypertension with a mean arterial pressure of 30, down from 40 three years earlier. (R. 1174–76.) On June 13, Dr. Chauhan reviewed the results with Barnwell and instructed him to resume taking torsemide. (R. 1174–76.)

On June 15, Barnwell returned to Danville RMC with chest pain and worsening shortness of breath. (R. 1124.) Barnwell reported on admission that he had been using oxygen 24 hours per day for the past month. (R. 1126.) Barnwell's troponins were normal, and his EKG showed no changes, eliminating the possibility of acute coronary syndrome. (R. 1124.) A chest x-ray showed mild peribronchial thickening suggestive of bronchitis and minimal patchy densities particularly in the right upper and lower lobes, "which may represent early pneumonia." (R. 1128.) Doctors prescribed metoprolol, azithromycin, and DuoNeb, increased Barnwell's amlodopine, and instructed him to take aspirin daily and Robitussin as needed. (*Id.*) They "held off on" an ACE inhibitor and discontinued Barnwell's lisinopril "due to [his] worsening renal function." (*Id.*) Barnwell was discharged the following day. (R. 1125.) Doctors addressed medication and diet compliance with Barnwell prior to discharge. (*Id.*)

Barnwell followed up with Dr. Chauhan on June 19 and June 26, 2012. (R. 1167–73.) Barnwell complained of continued shortness of breath, swelling in his feet, and dry cough. (*Id.*) Dr. Chauhan noted a diagnosis of diastolic heart failure grade 2/3, but also noted on June 26 that Barnwell was "not in heart failure." (*Id.*) Dr. Chauhan increased Barnwell's torsemide, decreased his isosorbide, and discontinued aspirin. (*Id.*)

On August 22, 2012, Barnwell underwent a six-minute walk test at Duke. (R. 1338–39.) Breathing room air, he walked 329.2 meters, which was only "mildly below the normal predicted range." (*Id.*) His peripheral blood oxygen saturation ($SpO_2$) remained above 98% throughout the exercise, demonstrating "adequate" gas exchange. (*Id.*)

On August 23, 2012, Barnwell reported swimming daily, but complained of continued swelling in his legs and shortness of breath after walking 100 feet. (R. 1341–43.) Dr. Chauhan noted that Barnwell's glucose was 347 and his cardiac enzymes were negative, and he indicated that Barnwell "does have diastolic heart failure." (*Id.*) Dr. Chauhan questioned whether Barnwell's generalized anasarca was due to uncontrolled diabetes with diastolic heart failure or because of "other reasons such as fatty liver, etc. because of poor diabetic control." (*Id.*) Dr. Chauhan took Barnwell off amlodipine because it could increase his leg swelling. (*Id.*)

On October 15, 2012, Barnwell complained of chest pain and shortness of breath while resting, with dizziness, sweating, and nausea. (R. 1412–14.) He also reported productive cough and leg swelling. (*Id.*) Dr. Chauhan noted that Barnwell was 25 pounds above his target weight, mostly "because of his kidney failure and his heart failure." (*Id.*) Dr. Chauhan added that Barnwell most likely experienced an "episode of [shortness of breath] with [chronic heart failure] which is because of his restrictive lung disease and his pulmonary [hypertension] and

fairly severe diastolic dysfunction." (*Id.*) He increased Barnwell's torsemide for his weight, but noted that this would have to be balanced with kidney disease. (*Id.*)

Also in October 2012, Dr. Chauhan drafted a letter addressed "To Whom It May Concern," discussing Barnwell's conditions. (R. 1411.) In the letter, Dr. Chauhan states that Barnwell has "a long history of [severe] restrictive lung disease … with CILD and an FEV1 of 1.36 and a DLCO of 40%," "moderately severe [pulmonary hypertension]," chronic bronchiectasis, "grade 2/grade 3 diastolic heart failure," obstructive sleep apnea, morbid obesity, stage 3 chronic kidney disease, and a 22-year history of diabetes. (*Id.*) After summarizing these conditions, Dr. Chauhan explained:

> Based upon his heart failure, his severe restrictive lung disease and his renal failure and his co-morbidity I have advised him to seek disability.
>
> He can barely walk 10–20 feet without becoming short of breath; he also cannot stand for more than 20 minutes.
>
> His exercise capacity is severely limited which makes him fairly sedentary, NYHA class III symptoms overall in spite of medical management.
>
> Based on all of this I would strongly recommend disability.

(*Id.*)

Barnwell was admitted to the emergency room at Danville RMC on October 23, 2012, with worsening shortness of breath and hemoptysis (coughing up blood).[4] (R. 1427.) An EKG showed "some tachycardia without any acute ST changes or T-wave changes." (R. 1430.) A chest x-ray showed "findings suggestive for [chronic heart failure]," but pulmonary infiltrates could not be excluded. (*Id.*) Barnwell's high BNP levels also suggested pulmonary edema

---

[4] The records of this hospital stay were not before the ALJ, but were submitted to the Appeals Council after the ALJ issued his decision (R. 8), a fact that neither party noted in their briefs. Because I recommend remand on a different basis, I do not consider whether this new evidence requires remand under the Fourth Circuit's decisions in *Wilkins v. Sec'y of Health and Human Servs.*, 953 F.2d 93 (4th Cir. 1991) (en banc), and *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011).

secondary to uncontrolled hypertension and diastolic heart failure, and in a detailed October 24 consultation report, Dr. Ryan O'Connell, D.O., noted his belief that these conditions were the cause of Barnwell's problems. (R. 1434–35.) However, because Barnwell's white blood cell count was elevated, doctors could not rule out pneumonia, and they prescribed antibiotics. (R. 1435.) Doctors restarted Barnwell's torsemide, which had been stopped due to concerns over chronic kidney failure. Barnwell's symptoms improved soon thereafter, although his creatinine went up, a sign Dr. O'Connell found "worrisome." (R. 1425, 1435, 1443.) Dr. O'Connell also noted that Barnwell's diabetes was uncontrolled during his hospital stay, likely due to corticosteroids. (R. 1425.)

Barnwell was discharged on October 27. (R. 1422.) On discharge, Dr. O'Connell noted several diagnoses, including secondary pneumonia and sepsis, resolving; chronic kidney disease stage 3, stable; accelerated hypertension, stable; hemoptysis, resolved; diastolic congestive heart failure with normal ejection fraction, currently stable; diabetes mellitus, type 2, poorly controlled; and restrictive lung disease, likely secondary to other conditions and currently stable. (R. 1422.) He noted that Barnwell was "doing well" with improved shortness of breath and no chest wall tenderness. (R. 1424.) Barnwell was instructed to continue using home oxygen, follow a "cardiac-prudent diet," and engage in physical activity "as tolerated." (R. 1424–25.) Dr. O'Connell also talked with Barnwell "at length multiple times about weight loss, diabetic control," and limiting salt, sugar, and fluid intake. (R. 1425.) Dr. O'Connell noted that Barnwell was at a high risk for readmission "secondary to nonadherence, noncompliance, as well as multiple comorbidities, which would put him at risk for needing hospital admission if he does not monitor his healthcare vigilantly." (*Id.*) In an October 28 addendum to Dr. O'Connell's discharge note, a pulmonologist noted that Barnwell has "what appears to be evolving diastolic

heart failure with probable flash pulmonary edema," but that he "could not exclude … atypical or possibly bacterial pneumonia with elevated white count." (R. 1443.)

IV.  Discussion

*A.  Listed Impairment*

Barnwell first argues that the ALJ should have found that he met Listing 3.02 for chronic pulmonary insufficiency. The third step of the Commissioner's process for evaluating disability claims requires ALJs to consider a claimant's severe impairments against the impairments listed in 20 C.F.R. part 404, subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii). "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); 20 C.F.R. § 404.1525(a). They "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). An impairment meets a listing if it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year] duration requirement." 20 C.F.R. § 404.1525(c)(3). An impairment or combination of impairments "is medically equivalent to a listed impairment … if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant bears the burden of demonstrating that his or her impairment meets or equals a medical listing. *Yuckert*, 482 U.S. at 146 n.5.

Listing 3.02 addresses chronic pulmonary insufficiency. Paragraph A mandates a finding of disability when a claimant has "[COPD] due to any cause, with the FEV1 equal or less than

19

the values specified in Table I corresponding to the person's height without shoes."[5] Table I provides that someone of Barnwell's height (69 inches) would meet the listing if his FEV1 value were less than or equal to 1.45 liters. Arguing that he meets this listing, Barnwell points to Dr. Chauhan's letter, which states that Barnwell has "a long history of restrictive lung disease with … an FEV1 of 1.36." (Pl. Br. 27; R. 1411.) Dr. Chauhan's letter itself is not a record of test results, and neither the doctor nor Barnwell cites a test that corresponds with this figure.  As the Commissioner points out (Def. Br. 15–16), FEV1 values must be established by valid pulmonary function test reports. *See* Listings § 3.00(E) (requiring FEV1 and FVC test results "should represent the largest of at least three satisfactory forced expiratory maneuvers"). Dr. Chauhan's letter is simply inadequate as a matter of law under the Commissioner's regulations, and I have found no test results in the record that correspond with the 1.36 value he cited.

The record does contain other evidence of an FEV1 value below the threshold. Spirometry performed at Duke in September 2011 showed an FEV1 value of 1.40 L (36% predicted). (R. 808, 811.) But these results, too, are not documented by taking the largest of at least three FEV1 scores necessary to satisfy the requirements of Listings § 3.00(E). Moreover, they are out of proportion with spirometry results elsewhere that record FEV1 scores of 2.36, 1.98, and 2.83. (R. 707–09, 800, 898–903.) Thus, Barnwell's argument that he meets or equals Listing 3.02 is without merit.

### B.  Treating Physician

Barnwell argues that the ALJ "irrationally and summarily dismissed" the opinions that Dr. Chauhan expressed in his October 25, 2012, letter, in violation of the treating physician rule.

---

[5] FEV1 stands for "forced expiratory volume in one second," and represents the amount of air a person can forcibly blow out in one second after breathing in fully. Listings § 3.00(E); *see also* John B. West, *Pulmonary Pathophysiology: The Essentials* 4 (2011).

(Pl. Br. 27–29.) An ALJ must weigh all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 404.1527. Opinions from physicians who have treated the patient are generally afforded more weight because treating sources are "most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2); *accord Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). An ALJ must give a treating source opinion "controlling weight" to the extent that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527.

Barnwell argues that the ALJ "erred in failing to consider all the factors" relevant to weighing a treating physician's opinion and that based on those factors, "the only rational decision that could be made is that Dr. Chauhan's opinion should be given great deference." (Pl. Br. 28–29.)

Even when a treating source opinion is less than "well-supported" by diagnostic techniques, it is still entitled to some deference. *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D. W. Va. 2012) (citing Social Security Ruling 96-2p). Thus, when an ALJ gives less than controlling weight to a treating physician's opinion, he must specify how much weight he gives the opinion and offer "good reasons" for that decision. 20 C.F.R. § 404.1527(c)(2); *see also Hines*, 453 F.3d at 564 n.2 (noting that an ALJ may reject a treating physician's opinion if there is "persuasive contrary evidence" in the record). In doing so, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his or her area of specialty. 20 C.F.R. § 404.1527(c).

Not every statement from a doctor regarding a patient's condition qualifies as a "medical opinion. "Medical opinions are statements from … acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). However, opinions on issues "reserved to the Commissioner," such as whether a person is disabled, are not considered "medical opinions" entitled to any special weight under the regulations. *See Huff v. Astrue*, No. 6:09-cv-42, 2010 WL 5296842, at *5 (W.D. Va. Nov. 22, 2010); 20 C.F.R. § 404.1527(d)(1); SSR 96-5p, 1996 WL 374183 (Jul. 2, 1996). At the same time, statements from treating physicians on these issues are relevant and often important evidence. The ALJ must evaluate these statements in light of the whole record to determine the extent to which the opinion is supported by the record, considering the same factors used to evaluate "medical opinions." SSR 96-5p, at *3; *see also* 20 C.F.R. § 404.1527(c).

It is worth noting, as the ALJ did, that the ALJ's RFC assessment is largely consistent with Dr. Chauhan's letter. Citing Barnwell's heart and renal failure, severe restrictive pulmonary disease, and co-morbidity, Dr. Chauhan opined that Barnwell "can barely walk 10–20 feet without becoming short of breath; he also cannot stand for more than 20 minutes"; his "exercise capacity is severely limited which makes him fairly sedentary." (R. 1411.) In summarizing the medical records, the ALJ noted some of the test results that Dr. Chauhan cited. He also found that Barnwell has severe chronic heart failure and chronic renal failure. While he did not note restrictive lung disease at step two, he did find that Barnwell has severe obstructive lung disease, and his decision shows that he considered the evidence relating to Barnwell's pulmonary function at subsequent steps of the decisional process. (*See* R. 20 (discussing Barnwell's COPD

22

under step three).) The ALJ also recognized that Barnwell could perform only sedentary work, consistent with Dr. Chauhan's description of Barnwell as "fairly sedentary." (R. 21, 31.) Finally, the ALJ recognized Barnwell's limited capacity for standing and walking not only by limiting him to sedentary work—which by definition "involves sitting" and less than "a good deal of walking or standing," 20 C.F.R. § 404.1567(a), (b)—but also by restricting him to standing and walking for just two out of eight hours during the work day. (R. 21.)

After summarizing the letter from Dr. Chauhan, whom the ALJ described as Barnwell's "treating cardiologist," the ALJ explained how he weighed the opinions in that letter:

> Statements that a claimant is "disabled" are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Social Security Regulations and legal standards. Such issues are reserved to the Commissioner…. Opinions on issues reserved to the Commissioner … can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. Dr. Chauhan's assessment is given little weight because Dr. Chauhan generally noted throughout the period that the claimant's condition was stable and on multiple occasions performed testing with mild to moderate or normal results, which are discussed in detail above. Furthermore, Dr. Chauhan's finding that the claimant is "fairly sedentary["] is consistent with the above residual functional capacity.

(R. 31 (internal citations omitted).)

Although the ALJ did not systematically mention each factor in explaining the weight given to Dr. Chauhan's opinion, his decision indicates that he considered all of the relevant factors in his discussion. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11-cv-29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 159564 (May 3, 2012) (Kiser, J.). In discussing Dr. Chauhan's opinion, the ALJ noted that Dr. Chauhan was Barnwell's "treating cardiologist" (R. 31), which indicates that the ALJ considered the relationship between the doctor and the claimant as well as the doctor's specialty. *See* 20 C.F.R. § 404.1527(c)(1), (2), (5). While the ALJ did not explicitly mention the

duration of the treating relationship between Barnwell and Dr. Chauhan or discuss the "nature and extent" of that relationship in his discussion of Dr. Chauhan's opinion, he summarized Dr. Chauhan's treatment records at length earlier in his RFC assessment. (R. 24–31); *see* 20 C.F.R. § 404.1527(c)(2)(i), (ii). And the ALJ's reasons for discounting Dr. Chauhan's opinion show that the ALJ considered the supportability of that opinion and its consistency with the record. *See id.* § 404.1527(c)(3), (4).

The ALJ's reasons for granting less weight to Dr. Chauhan's opinion were adequate and supported by substantial evidence. While the ALJ's characterization of Barnwell's condition as "stable" during the relevant period is debatable, it is not without support in the record. The ALJ correctly noted that the objective testing Dr. Chauhan performed did not indicate that Barnwell's condition was so severe that he could not perform even sedentary work. An echocardiogram on April 24, 2012, showed "normal diastolic dysfunction," and another echocardiogram taken in June 2012 showed only grade II diastolic dysfunction.[6] (R. 1177–79, 1210.) A catheterization on June 13, 2012, showed only mild to moderate pulmonary hypertension with a reduced mean arterial pressure. (R. 306.) Dr. Chauhan also noted normal and stable EKGs throughout the relevant period. (R. 888, 1172, 1181, 1194.) Dr. Chauhan's largely conclusory opinion that Barnwell is disabled is not entitled to any special weight under the Commissioner's regulations, *Huff*, 2010 WL 5296842, at *5; 20 C.F.R. § 404.1527(d)(1); SSR 96-5p, and the ALJ did not err in rejecting it because it lacked support in the results of objective tests that Dr. Chauhan himself

---

[6] Barnwell's echocardiograms do consistently show "severe" or "massive" left ventricular hypertrophy, dating back at least to March 2011. (R. 815, 833, 1177–79, 1210.) The presence of this finding in a March 2011 study suggests that, in Barnwell's case, it does not necessarily correlate with disabling symptoms and limitations, because Barnwell was working at the time and reported that he could walk half a mile without difficulty. (R. 813–16.)

ordered. Considering the medical evidence in the record, I find that substantial evidence supports the ALJ's treatment of Dr. Chauhan's opinion.

### C. *Residual Functional Capacity*

Barnwell also argues that the ALJ erred in several respects in assessing his residual functional capacity ("RFC"). A claimant's RFC is "the most [the] claimant can do despite his limitations." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006); 20 C.F.R. § 404.1545. The RFC should reflect what a claimant can do "on a regular and continuing basis." 20 C.F.R. § 404.1545(b), (c). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Jul. 2, 1996). An RFC assessment "must be based on *all* of the relevant evidence in the case record." *Id.* at *5. This includes "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." *Id.* An ALJ must consider the combined effect of a claimant's impairments in assessing the claimant's RFC. *See* 42 U.S.C. § 423(d)(2)(B); *Walker v. Bowen*, 889 F.2d 47, 49–50 (1989).

Barnwell argues that the ALJ erred in failing to consider the difficulty his doctors had in treating all of his impairments at once, the effects of his obesity in combination with his impairments, and the limitations imposed by his use of an oxygen tank. (R. 29–30.) Barnwell's argument about his obesity is without merit; the ALJ specifically noted that he "accounted for" obesity along with Barnwell's other conditions in his RFC assessment (R. 31; *see also* R. 20-21), and Barnwell does not explain how his obesity would have imposed functional limitations beyond those incorporated by the ALJ. His other two arguments, however, are more substantial. Because Barnwell's oxygen use is dispositive, I will address it first.

25

*1. Supplemental oxygen*

Medical records document Barnwell's oxygen use starting in August 2011. In a discharge summary from Barnwell's August 24–28 hospital admission, the doctor indicated that Barnwell would require home oxygen at two liters per minute. (R. 1039.) A discharge summary from Barnwell's September 3–5 hospitalization indicates "Oxygen 2L at all times" among his discharge medications. (R. 496.) Dr. O'Neill noted on September 6, 2011, that Barnwell had been prescribed oxygen to "administer as directed." (R. 766–70.) On September 13, 2011, Dr. Fortin noted that Barnwell had been on oxygen "for the last 3–4 weeks or so" and that Barnwell thought it was helping "a little bit." (R. 810; *see also* R. 811 (noting that Barnwell "does have an oxygen requirement").) On January 5, 2012, when Barnwell presented to Dr. Chauhan with complaints of shortness of breath and recent chest pain, Dr. Chauhan instructed him to see if oxygen helped. (R. 887–90.) Treatment notes from Barnwell's hospitalization in late May 2012 indicate that he was on home oxygen. (R. 999, 1008.) On June 4, 2012, Dr. Chauhan noted Barnwell was on constant oxygen, but still suffered shortness of breath. (R. 1177–79.) On June 15, Barnwell told doctors at Danville RMC that he had been using oxygen constantly for the past month. (R. 1126.) And treatment notes from a hospital stay in October 2012 also indicate that Barnwell was "on 2L of oxygen" for "restrictive lung disease." (R. 1449.)

Barnwell also used supplemental oxygen at the ALJ hearing in October 2012. (R. 51.) At the hearing, he testified that he used his oxygen most of the time and that, while he "might have one or two days off [his] oxygen where [he] can do room air," his oxygen "[i]s a constant companion." (*Id.*)

The ALJ noted the evidence of Barnwell's oxygen use in the medical records and Barnwell's testimony. (R. 22, 27, 30.) However, the ALJ did not limit Barnwell's RFC to accommodate even occasional oxygen use or include any such limitation in the hypotheticals he

26

presented to the vocational expert ("VE"). (R. 21, 55–56.) The ALJ did not explain why he did not limit Barnwell to jobs that would accommodate oxygen use. Nor did he find that Barnwell did not actually need to use supplemental oxygen; in fact, he relied on Barnwell's improvement with treatment in finding him not disabled. (*See* R. 23.) And, although he noted Barnwell's occasional "medication and treatment noncompliance" and "failure to follow up with recommended specialists" in finding Barnwell less than fully credible, he did not find that Barnwell would not need oxygen had he complied with his doctors' other instructions. "Because the ALJ failed to make any specific findings regarding [Barnwell's] oxygen use, it is unclear whether the ALJ also rejected [Barnwell's] allegations that [he] needs oxygen…." *Andrews v. Comm'r of Sec. Sec.*, No. 6:11-cv-898-Orl-GJK, 2012 WL 4194656, at *8 (M.D. Fla. Sept. 19, 2012).

As noted above, the ALJ must account for all of the limitations caused by the claimant's treatment in assessing the claimant's RFC. Here, the RFC did not include Barnwell's documented need for oxygen, and the ALJ did not present a hypothetical to the VE that included accommodation for oxygen use. If the ALJ thought that Barnwell required oxygen to function at work, he must have included an accommodation for oxygen use in the RFC determination and hypothetical to the VE. *See, e.g.*, *Carnaghi v. Astrue*, 886 F. Supp. 2d 861, 870 (N.D. Ill. 2012); *Andrews*, 2012 WL 4194656, at *4, *8; *Bogan v. Astrue*, No. 09 C 4604, 2010 WL 5391196, at *8–10 (N.D. Ill. Dec. 20, 2010); *Meade v. Astrue*, Civ. No. 3:06-1007, 2009 WL 2160689, at *2 (S.D. W. Va. July 14, 2009). The ALJ's failure to make any findings on these issues was error.

Between the medical records and his own testimony, Barnwell has presented sufficient evidence documenting his need for oxygen such that a reasonable ALJ could find that he would require oxygen at work. (*See* R. 51, 496, 776–70, 810–11, 887–90, 999, 1008, 1039, 1126, 1177–

79, 1449.) There is no evidence in the record that businesses employing people in jobs the ALJ found that Barnwell could perform would accommodate an employee who needed to use supplemental oxygen, and other cases suggest some disagreement among vocational experts on the question. *Compare Meade*, 2009 WL 2160689, at *2 (VE testified that sporadic use of oxygen precluded all employment); *Andrews*, 2012 WL 4194656, at *4 (VE testified that use of oxygen for six of eight hours in a day precluded substantial gainful employment); *Bogan*, 2010 WL 5391196, at *3 (VE testified that use of portable oxygen precluded competitive employment "unless an employer were willing to work out a special accommodation"), *with Whitt v. Comm'r of Soc. Sec.*, No. 1:12-cv-52, 2013 WL 4784991, at *38 (N.D. W. Va. Sept. 6, 2013) (VE testified that significant number of jobs existed meeting RFC that accommodated use of oxygen "as might be necessary during or throughout the workday"); *Edwards v. Colvin*, No. 4:12-cv-01977AGF/DDN, 2013 WL 4666344, at *12 (E.D. Mo. Aug. 30, 2013) (VE testified that jobs existed in significant numbers that would accommodate claimant's need for oxygen); *Pendleton v. Comm'r of Soc. Sec.*, No. 1:10-cv-650, 2011 WL 7070519, at *6–7 (S.D. Ohio Dec. 23, 2011) (VE testified that use of oxygen tank would preclude work above sedentary level). Because there is no evidentiary basis in this record to support a finding that a person requiring supplemental oxygen could perform the jobs identified by the VE, I cannot conclude that the ALJ's decision is supported by substantial evidence.

    2.   *Combined effects of impairments*

    Barnwell also faults the ALJ for failing to consider the combined effects of his impairments in assessing his RFC and asserts that if the ALJ had done so, "the only result" he could have reached "is that [Barnwell] was disabled." (Pl. Br. 29.) Barnwell explains that

> [e]ven [his] doctors expressed that they could not control all of his medications because of all of his conditions. They could not control his kidney disease and fluid retention because of his congestive heart failure. Medications administered

for his congestive heart failure, specifically prednisone, affected his blood sugars. Factor into this the high blood pressure which could not be controlled and his restrictive lung disease. The evidence supports this as the records abounds with multiple long stay hospitalizations where even the doctors with the full hospital staff had difficulty managing his medications and medical conditions because of the number of his conditions.

(*Id.*)

Barnwell is correct to note the difficulty that his doctors had in managing all of his conditions at once. On numerous occasions, his doctors discontinued or declined to pursue preferred treatment options for one condition because of potential adverse effects on another. In March 2011, Barnwell was taken off of the diabetes drug Actos due to his congestive heart failure. Barnwell's doctors twice discontinued Norvasc (amlodopine), an antihypertensive calcium channel blocker, also because of concerns over heart failure and edema. (R. 253.) On multiple occasions, doctors reduced, discontinued, or limited use of Lasix (furosemide)—a loop diuretic indicated for edema, hypertension, and heart failure that is recognized as a "first-line agent" for acute heart failure or cardiogenic pulmonary edema, *see* Robert B. Taylor, *Taylor's Cardiovascular Diseases* 117–118 (2005), due to concerns about Barnwell's kidney function. (R. 1033, 1039, 1040.) After Barnwell's doctors switched his loop diuretic to torsemide, they continued to note difficulty in balancing his diuretic therapy with his kidney disease. (R. 1414, 1425, 1448–49.) Doctors also temporarily stopped glipizide (an anti-diabetic) and lisinopril (an ACE inhibitor used for hypertension and congestive heart failure) due to kidney injury. (R. 1033, 1039, 1128.) And, during Barnwell's October 2012 hospital admission, doctors noted that prednisone, which had been prescribed for pneumonia and COPD, likely caused uncontrolled diabetes during his stay. (R. 1425) They also noted that Barnwell's "multiple comorbidities" contributed to his risk of readmission. (*Id.*) Thus, the problems that Barnwell's physicians

encountered in their efforts to treat all of his conditions could well have contributed to his numerous hospital stays and the duration of some of those stays.

Although the ALJ noted each of Barnwell's impairments and stated that his RFC assessment "accounted for" all of them, he failed to note the difficulty Barnwell's doctors had in simultaneously controlling all of his conditions. Because I recommend remand on other grounds, I express no opinion on whether the ALJ's decision provides the Court with adequate assurances that he did consider the combined effects of Barnwell's impairments. But on remand, the ALJ would do well to explain how he considered the combined effect of Barnwell's impairments and the medications his doctors prescribed for them. *See Phillips v. Astrue*, No. 4:11-cv-1018, 2012 WL 3765184, at *4 (D.S.C. Jun. 11, 2012) (noting that an ALJ's prior decision has "no preclusive effect" on remand from the district court, thus allowing the ALJ to "reconsider and re-evaluate the evidence as part of the reconsideration of [the applicant's] claims" *de novo* (citing *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763 n.3 (W.D. Va. 2002) (Kiser, J.))).

That is not to say that Barnwell is incapable of sedentary work. The ALJ found that he was capable of such work, and his analysis is reasonable at least on its face. The ALJ explained that he rejected Barnwell's reports of more severe limitations because of Barnwell's "medication and treatment noncompliance, failure to follow up with recommended specialists, and routine and conservative treatment." (R. 32.) Earlier in his decision, the ALJ noted that Barnwell "has remained stable or improved over the course of his treatment with compliance." (R. 23.)

The ALJ was justified in noting Barnwell's inconsistent compliance with his doctors' instructions. Hospital doctors noted on numerous occasions that Barnwell was at times noncompliant with medications (R. 496, 594, 605, 1013), and indicated that Barnwell ran a high risk for readmission due to noncompliance with medications or diet. (R. 342, 1425.) Dr. Baveja

also noted Barnwell's history of medication noncompliance (R. 1248, 1403–04), and Dr. Chauhan's records indicate that he frequently counseled Barnwell about the importance of taking his medication. (R. 823–25, 1180–85, 1190–95, 1412–14.)

The ALJ also appropriately considered Barnwell's improvement with treatment. Barnwell was hospitalized four times for a total of thirty days during a three-month span between mid-July and mid-October 2011. Between October 11, 2011, and November 30, 2012 (the date of the ALJ's decision), Barnwell was hospitalized three times: twice for a total of eight days in late May and early June 2012, and once for five days in October 2012. The record before the ALJ contained only the May and June hospital stays.

Finally, some of the objective test results in Barnwell's medical records suggest that his condition was not as severe as he claimed. In particular, Barnwell's August 22, 2012, pulmonary function test, where he was able to walk 320.2 meters in six minutes without supplemental oxygen, stands out. (R. 1338.) The results of this test seem to suggest that Barnwell, at least at his baseline level of functioning, can do sedentary work.

Lastly, the medical records in this case are voluminous and sometimes highly technical. The most technical documents in the record—the reports of diagnostic tests—are especially important in this case. The central issue in this case is whether Barnwell's heart and lungs work well enough for him to work on a continuing basis. While the record contains a wealth of objective test results, the medical and functional implications of these results are not always entirely clear from the record. Moreover, the results of some of the tests seem at odds with each other. A doctor with expertise in the relevant medical fields could explain what the objective test results say about Barnwell's medical conditions and the resulting functional limitations. On remand, the Commissioner should consider obtaining testimony from a medical expert.

### V.  Conclusion

Based on this record, I cannot find that the Commissioner's decision is supported by substantial evidence. I therefore recommend that this Court **GRANT** Barnwell's motion for summary judgment (ECF No. 16), **DENY** the Commissioner's motion for summary judgment (ECF No. 19), **REVERSE**  the Commissioner's final decision, and **REMAND** this case for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review.  At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER:  July 18, 2014

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge